[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The complaint filed in this matter brings to the court a controversy involving several members of the greater Wooldridge family over the management of assets consisting of mortgages and real estate as listed in the schedule attached to plaintiffs' Ex. 1. The plaintiffs are John and Ramona Wooldridge and the principal defendant is William R. Wooldridge (hereinafter referred to as "W.R.W."). The defendant W.R.W. is the brother-in-law of Ramona Wooldridge and the first cousin of John Wooldridge. The business endeavors of the family commenced in the 1930's and developed over time into delivery of gas and fuel oil to gas stations owned and leased to operators. In 1974 a number of the service stations were sold but some property remained which required management on an intermittent basis and certain mortgages remained outstanding wherein the "family" was the mortgagee. For the purposes of management of these assets and collection and distribution of income gained therefrom a Joint Venture agreement between the parties was executed, Plaintiffs' Ex. 1, on May 29, 1974. This agreement set forth the respective interests of the participants in units and the participants would share in the distribution of profits and income according to their interest. As a part of the Joint Venture agreement, it was provided that an Administrator would be designated to manage the affairs of the Joint Venture and the CT Page 211 Joint Ventures would establish the extent of the manager's duties and responsibilities. This apparently was never done but the defendant William Wooldridge assumed the duties of managing partner. This involved the bookkeeping and office work which he had been doing for the several Wooldrige businesses prior to the dissolution of the corporations and the execution of the Joint Venture agreement. John Wooldridge who had generally tended to outside work of a maintenance nature over the period from 1945 to 1973 continued in that capacity with the Joint Venture activities but his duties were greatly diminished with the dissolution of the corporation. As he testified, "I had nothing to do."
Ramona Wooldridge's involvement was limited both by family tradition which excluded any of the women from participation in the activities of the corporations and her removal to Florida in 1975 where she became a Florida resident, living there a significant part of the year. All of the foregoing illustrates the conclusion of the court from the evidence presented that the parties were content to leave the management of the Joint Ventures aims and objectives pretty much up to the defendant William Wooldridge. Some of the matters of which John Wooldridge complains of which he says he knew were going on but "I never inquired about them." In any event, in 1986 Ramona and John ordered William Wooldridge out of the office and subsequently brought this lawsuit alleging certain shortcomings in William's performance as managing partner. These are set out in the plaintiffs' Eight Count complaint.
The First Count of the plaintiffs' complaint alleges that the defendant W.R.W. violated the Joint Venture agreement in several ways; that he did not distribute money to the partners in accordance with the agreement, that he released obligations owed to the partnership without authorization and that he failed to allow plaintiffs complete access to the partnership books. As previously suggested, the testimony of Ramona Wooldridge, John Wooldridge and W.R.W. indicate that the day to day management functions were pretty much left to W.R.W. to run out of the office located in West Hartford, Connecticut. Ramona was a frequent visitor to the office, presumably to discuss the business. This involvement continued over the period 1974 when the Joint Venture agreement was executed to 1986, a twelve year span during which Ramona Wooldridge spent time in Florida to take advantage of certain tax benefits. This necessarily limited her involvement in the affairs of the partnership. John Wooldridge was active in outside work concerning the properties owned by the Wooldridge family over the years prior to the dissolution of Wooldridge Brothers, Inc., but when these were disposed of by the lease of the gas stations to Exxon, his activities were very curtailed. He testified that W.R.W. also CT Page 212 had little to do except the book work and the accounting. John was authorized to write checks against the accounts of the Joint Venture but was content to let W.R.W. perform this role exclusively. W.R.W., over this period, collected rents, mortgage payments and disbursed income and profits periodically, to the partners. Brenton Brodeur testified that he was the accountant for the partnership for several years prior to W.R.W. being ousted and did the tax returns for the Joint Venture, as well as of for individual members. His testimony disclosed that all members of the Joint Venture borrowed money from time to time over the years and at no time did any of the partners involved herein pay any interest to the Joint Venture for the use of the money and these loans were pa id back by deducting them from the periodic distribution of income. He further testified that W.R.W. had fully repaid all loans or advances which he made to himself and the Joint Venture partners have sustained no loss on this account. The account books reflect the loans as asked for by the partners and their status and no improprieties were noted. It was the partners' custom to borrow sums of money and to the extent that such funds were available, W.R.W. would issue checks upon request. While the Joint Venture agreement did not expressly authorize advances by way of loans to any of the partners, it became their custom to request and receive such advances without the consent of the remaining partners. This further illustrates the informal manner in which the affairs of the Joint Venture were conducted over the span of the agreement until the ouster of W.R.W. There is nothing to suggest to the court that the plaintiffs were denied access to the books and accounts. The evidence indicates that for many years, as has already been noted, the plaintiffs were more than content to allow W.R.W. to perform his duties as managing partner without their involvement. It is also claimed in the first count that W.R.W. improperly released claims of the partners by selling property and discounting mortgages owned by the partners without consulting them and in fact signing the necessary documents to accomplish these transfers without their knowledge or approval.
Attorney Milton Widem, a respected member of the Hartford Bar specializing in real estate matters, testified that he represented the Wooldridge family business interest for a number of years as well as the Joint Venture partners over the twelve year period from 1974 to 1986. Despite the plaintiffs' claims that W.R.W. acted improperly in discounting mortgages and selling assets, Mr. Widem's testimony established that there were reasonable and justifiable explanations for W.R.W.'s actions in this regard which were based upon sound legal advice under the circumstances prevailing at the time. While Mr. Widem dealt mainly with W.R.W. for his legal services to the Joint Ventures, the plaintiffs were aware of his long standing CT Page 213 relationship with the family. There appears nothing in the record to suggest that any partner could not have consulted Mr. Widem about any matter which might have troubled them had they so desired. John Wooldridge, for example, testified that he knew of "these things going on but I never inquired about them." Insofar as the allegations of the first count are concerned, the court finds W.R.W.'s testimony credible. Explanations were offered by him as to the plaintiffs' several claims which appear reasonable to the court and supported by the evidence. Sec. 34-47 C.G.S. allows a partner with general authority to act upon behalf of the partnership and there is nothing in the record to indicate that W.R.W.'s authority to so act up to 1984 was in any way restricted. The function of a managing partner necessarily involves the exercise of discretion in the performance of the business carried out and the record does not disclose any abuse of the discretionary authority which the partners tendered to W.R.W. over the period testified to.
The Second Count alleges that W.R.W. withdrew money from the Joint Venture funds for his own personal use without consent or authorization which he failed to repay. The plaintiffs' in their brief claim that W.R.W. wrote checks to himself which were characterized as loans on the books but they were greatly in excess of the amounts borrowed by the plaintiffs and they were without the approval of the plaintiff. The court already has had occasion to refer to the practice of the partners of borrowing money in advance of the periodic distribution of profit and that no interest was ever charged to any of the borrowers. The requests as made by the individual plaintiffs were always honored by W.R.W. unless at the particular time there were insufficient funds to cover the request. On one occasion W.R.W. testified that the McAuliffe mortgage was sold because Ramona Wooldridge wanted an advance of $20,000 for her daughter's wedding and the Joint Venture didn't have that amount of cash on hand to meet her request. The testimony suggests that borrowings by the partners on a non-interest basis were not uncommon and that all engaged in the practice. And as previously indicated by Brodeur all the loans were repaid by adjustments to distributions due the individual partners according to their unit interests. According to Brodeur the records of all of the loans were recorded in the appropriate journals and there is no evidence of any improper activity on the part of the defendant W.R.W. that was engaged in to the exclusion of the other partners in the Joint Venture agreement.
The Third Count alleges a breach of fiduciary duty on the part of W.R.W. in that he improperly compromised assets of the Joint Venture by discounting mortgages, that he grossly mismanaged and neglected the business and books, that he misappropriated money to his own benefit, that because of his CT Page 214 own activities in the real estate option business a conflict was created with his responsibilities as manager of the Joint Venture assets and in general conducted himself in a fashion contrary to the interests of the Joint Ventures. As has already been noted evidence of claimed wrongdoing as regards the discounting of mortgages by W.R.W. does not support the conclusion of wrongdoing on the part of W.R.W. A great deal of time was spent through several witnesses concerning these transactions but they all appear to have been concluded by the defendant W.R.W. for valid reasons lying within his general authority as managing partner. One mortgage was sold at a discount to provide funds to honor Ramona Wooldriges request for a loan. The Kagan and DiPersio mortgages were sold at a discount for reasons testified to by Attorney Widem and W.R.W. They were poor performers and as to the DiPersio mortgage, the plaintiff John Wooldridge himself had problems in collecting the payments. As to selling them for less than book value, the court and the parties are aware that a mortgage cannot be sold for its full face value at maturity; that it is common and usual that a present sales price must be less than maturity value to be of any interest to a purchaser. The Joint Venture agreement vested the authority to manage the assets of the Joint Venture in W.R.W. and this he did for a lengthy period of time. As already noted by the court herein, management involves judgment and judgment involves the exercise of discretion. The defendant has offered reasonable explanations of his actions which are credible to the court as well as Attorney Widem who offered legal advice to W.R.W. upon which W.R.W. relied upon in discounting these mortgages and particularly the mortgage of Leah of which the plaintiffs complain. The court cannot conclude from the evidence offered that W.R.W. abused for any personal gain the authority given to him by his partners. The transactions were duly recorded in the books and ledgers and were available to the parties for their review had they desired to intercede at any time.
The plaintiffs' also claim damages because of W.R.W.'s custom of writing checks to himself and later voiding them. This practice was explained by Mr. Brodeur, the accountant, and has been characterized by the plaintiffs as "kiting checks." While the court does not accept this practice as falling within the ambit of sound business practices, the fact remains that an examination of the books shows that all payments were covered routinely by W.R.W. and no loss was sustained by the partnership or the individuals.
The plaintiffs claim generally that W.R.W. engaged in activities which conflicted with his duties as managing partner. This complaint centers around his activities in obtaining options on property which he would transfer to interested CT Page 215 parties. He carried on this business at the location of the offices of the Joint Venture and on occasion used stationary of "Joint Ventures" as well as office equipment. The use of office equipment was also engaged in by other members of the partnership agreement as well. This was done while he was engaged in his usual activities as manager. The plaintiffs claim that these activities impinged upon his responsibilities as manager and constituted a conflict. Historically, this was W.R.W.'s function with the prior Wooldridge enterprises. At the outset of the Joint Venture agreement, he was involved in real estate transactions and obtained options for Exxon on his own account. His continuation with these activities was surely known to the partners as well as the location from which he carried on the businesses and nothing changed with the advent of the agreement. According to the terms of the agreement, his responsibility was to manage the assets listed in the property list (Exhibit A of plaintiffs' Ex. 1). Nothing in this agreement allowed the defendant to purchase real estate in the names of the partners on speculation or otherwise nor did the other partners ever suggest that he do so. Ramona Wooldridge testified that the partnership never bought any property nor did they have any interest in doing so. He engaged himself in the management of the properties and assets and there is no evidence that this activity was affected adversely by his real estate business. The position of manager was unpaid, it did not demand his full attention and there was nothing in the venture agreement that prohibited his activities in this regard. No conflict has been demonstrated by the evidence and aside from expenditures by way of stationary usage no loss to the partners has been demonstrated. As to the claim that he used partnership funds to purchase options, W.R.W. admitted that he did borrow money by way of advances on occasion but this was no different than the "borrowings" of the other partners and by testimony of others it has already been noted that these loans were all paid back. The court cannot conclude that the plaintiffs have sustained their burden proof as to the allegations of the third count.
The Fourth Count of the plaintiffs complaint alleges that by reason of the defendants actions as managing partner as previously noted he breached his fiduciary duty of undivided loyalty to the Joint Venture in violation of Conn. Gen. Statutes 34-46, 34-56, 57, 58, 59, 60 and 70, all sections forming a portion of Chapter 611 "Uniform Partnership Act." As briefed by plaintiffs' counsel it is claimed that the defendants actions in what has been called "check kiting", (a term disputed by the defendant as there is no evidence that bank balances were affected as these transactions were noted in the appropriate accounts and a correct balance was always reflected), amounted to falsification of the books of account and thereby concealment of CT Page 216 the true state of the ventures financial affairs. Plaintiffs also claim the statutory violations were brought about by W.R.W.'S compromise of debts without disclosure or authorization and his activities in the real estate business. All of these claims have been previously discussed and determined in connection with the claims made in the several preceding counts. It was and is the courts conclusion that the plaintiffs' claims have not been supported by the evidence presented to the court and accordingly the claimed statutory violations set out in this Fourth Count are not found to be established for the reasons as previously set fourth.
The Fifth Count of the plaintiffs' complaint deals with amounts claimed to be due for accounting services instigated by the plaintiffs upon their conclusion in 1986 that their interests would be better served by their assuming the management of the ventures affairs and their ouster of W.R.W. on March 22, 1986. This Memorandum of Understanding (Plaintiffs' Ex. 35) entered into on May 6, 1986 provided, inter alia, that the books and ledgers would be examined by competent professionals, that any amounts found to be due from any of the partners would be deducted from their proportionate share of the assets and that the accounting expense be paid by W.R.W. in the event that the analysis determined that W.R.W. owed the partnership money while the other partners did not. It is the plaintiffs claim that the audit determined an obligation on the part of W.R.W. and that he has failed to reimburse the Joint venture pursuant to the memorandum in the amount of $15,361 for accounting fees (Plaintiffs' Ex. 56) and $13,481 for legal fees. The testimony of Brenton Brodeur who examined the accounts along with Robert Rhodes pursuant to the Memorandum of Understanding indicates that an exhaustive review was undertaken of the activities and accounts of all of the partners as reflected therein. Mr. Brodeur concluded from this examination that all partners had taken non-interest bearing loans or advances and that all such loans had been paid back. He determined that the capital and equity account of W.R.W. had been in a deficit status but because of appreciation in value of the rent property held by the Joint Venture the deficit had been eliminated. Counsel for the defendant points out in his brief that there was a discrepancy of $9,200 for which no explanation was forthcoming by W.R.W. and plaintiffs' Ex. 20 demonstrates that check No. 3030 in the amount of $2,500 was made out to J.R.W. Enterprises but cashed by W.R.W. There reasonably may have been other short-comings in the accounts over the twelve year span of the agreement but, as has been pointed out, the defendant W.R.W. was not an accountant and the audit did not suggest anything but minor discrepancies and certainly no situations showing fraudulent intent. However, it is the courts conclusion that these items, as noted, together with the defendants style of CT Page 217 accounting, justify the plaintiffs' claim that the defendant bear the cost of the accounting in its entirety as he was responsible for the maintenance of the books. As to the plaintiffs claim that the defendant assume the legal costs incident to the audit and other activities commissioned by the plaintiffs, the Memorandum of Understanding seems to concern itself with only accounting fees. Unless it is a matter of express provision, the court concludes that a parties counsel fees are an obligation only of the party retaining counsel. See, Peterson v. Norwalk, 152 Conn. 77, 80 as pertains to counsel fees incurred in litigation. See, also, Marsh Day and Calhoun v. Solomon, 204 Conn. 639, 652. Accordingly, judgment may enter for the plaintiffs on the Fifth Count in the amount of $15,361, plus costs as representing accounting fees incurred pursuant to the exhibits submitted.
Plaintiffs Sixth Count seeks punative damages and attorneys fees through the application of C.G.S. 42-110b "CUTPA" claiming that the misconduct of W.R.W. as alleged in the preceding five counts constitute the elements necessary to provide a recovery under the provisions of Chapter 735. Since the court has not been persuaded that the plaintiffs have satisfied their burden of proof as regards the various counts of the complaint with the exception of the Fifth Count involving only the dispute as to liability for accounting and legal fees it appears that the question of the application of CUTPA is limited to a consideration of whether W.R.W. engaged in deceptive acts or practices while performing his responsibilities as managing partner. A determination as to whether a practice violates the Unfair Trade Practices Act depends upon whether the practice offends public policy as it has been established by statutes, the common law, or otherwise, whether the practice is immoral, unethical, oppressive or unscrupulous and whether the practice causes substantial injury to consumers, competitors or other businessmen. Sportsmens Boating Corp. v. Hensley, 192 Conn. 747. As has been previously observed by the court, the defendants activities as recorded in the books and records have been closely scrutinized by experts and his operation of the Joint Venture business has been testified to by all parties involved. Since the court has not concluded that W.R.W. has violated his obligation as a fiduciary in representing the interests of the Joint Venturers, the relief demanded by the plaintiffs is not supportable. Additionally, it would not appear that the provisions of CUTPA are intended to apply to internal disputes as a necessary requirement to the application of CUTPA is that the practice complained of cause substantial injury to consumers (competitors or other businessmen) as noted above. See, Jesperson v. Ponchitera, CV88-0096615, J.D. of Stamford/Norwalk 15 C.L.T. 46, 26. Accordingly, judgment may enter for the defendant on the Sixth Count. CT Page 218
The Seventh Count seeks a dissolution of W.B. Associates pursuant to Sec. 34-70 Conn. Gen. Stat. While the court cannot make a finding that the prerequisite to such a decree under the provisions enumerated therein, Sec. 34-70 (1) a through exit does find that there are circumstances extant that render a dissolution equitable as provided under 34-70 (i)(f) C.G.S. This is particularly so with the existing antagonistic atmosphere which prevails between the partners and their expressed desire to terminate the relationship established by the Joint Venture agreement. (See plaintiffs' brief, p. 47 and defendants' brief p. 30).
Counsel for the plaintiffs are directed to prepare the appropriate judgment and necessary orders to effectuate the Dissolution and winding up of the affairs of the partnership as prayed for in the complaint. Upon approval, the court will entertain a motion for judgment for the plaintiffs on the Seventh and Eighth counts pursuant to statutory provisions.
RIPLEY, J.